54 F.3d 498
 William Lewis ASHLEY, Jr., Hugh K. Nisbet, III, Plaintiffs-Appellees,
v.
R.D. COLUMBIA ASSOCIATES, L.P., a Delaware Limited
Partnership, Defendant-Appellant.
R.D. COLUMBIA ASSOCIATES, L.P., Third Party-plaintiff Appellant,
v.
NORTH AMERICAN ROOFING SYSTEMS, INC., Third Party-defendant Appellee.
 No. 94-2041.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 18, 1994.
Decided May 9, 1995.
 
 Thomas Magee, St. Louis, MO, argued (Gregory T. Mueller, on the brief), for appellant.
 Gino Battisti, St. Louis, MO, argued, for appellee.
 Before RICHARD S. ARNOLD, Chief Judge, BRIGHT, Senior Circuit Judge, and McMILLIAN, Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 R.D. Columbia Associates, L.P. ("Columbia"), appeals from a final judgment entered in the United States District Court[1] for the Eastern District of Missouri upon a jury verdict finding them liable to William Ashley and Hugh Nisbet ("plaintiffs") for injuries resulting from a carbon monoxide poisoning incident. For reversal, Columbia argues that the district court erred in (1) denying its motion for judgment as a matter of law based on sufficiency of the evidence, (2) allowing plaintiffs to refer to punitive damages in opening statement and prohibiting defense counsel from discussing punitive damages in closing arguments, and (3) denying its motion for remittitur. For the reasons discussed below, we affirm the judgment of the district court.I. BACKGROUND
 
 
 2
 Plaintiffs were roommates in Apartment 623 of the Gatehouse Apartments in Columbia, Missouri. On Wednesday, May 22, 1991, while at home, they began to feel ill. The next day, May 23, plaintiffs each experienced severe nausea and fatigue. Neither left the apartment the entire day. Plaintiffs testified that they have little recollection of the events of either Friday, May 24, or Saturday, May 25.
 
 
 3
 On Saturday evening, Nisbet's mother, Carol Nisbet, telephoned her son. After he told her that he felt sick, Mrs. Nisbet and her daughter then drove from their home in St. Louis to check on him. Soon after their arrival at the apartment, plaintiffs were rushed to the University of Missouri Hospital where they were treated for carbon monoxide poisoning. Ashley had a level of carbon monoxide in his bloodstream of 26.6% and Nisbet had a level of 35.4%. Plaintiffs introduced expert testimony which indicated that an individual will become comatose if the carbon monoxide level in the bloodstream reaches 40%.
 
 
 4
 Plaintiffs' apartment is two floors directly above the building's utility room which houses the water heaters. A pipe which vents carbon monoxide from the utility room to the outside runs through a closet in their apartment. When Nisbet returned to his apartment shortly after the incident, he noticed a two-inch by two-inch hole in the drywall inside his closet and exposed piping. Plaintiffs alleged that the carbon monoxide which poisoned them came from these water heaters.
 
 
 5
 There were five water heaters in the utility room. The number of water heaters operating at one time was a function of the demand. It was a so-called "staggered system" designed and set up by a Columbia employee in order to conserve energy. At the time of the incident, the last week of May, the majority of the building's tenants, college students, had already vacated the premises. Therefore, the demand for hot water was at relatively low levels. A Columbia employee checked the water heaters monthly to make sure that certain circulating pumps had sufficient oil. These inspections, however, did not include the ventilation system. In November 1990, a tornado struck the building and caused significant damage. John Cox, the Columbia employee in charge of heating, air conditioning, and ventilation, testified that he did not check the water heater ventilation system at any time from the date of the tornado until the carbon monoxide poisoning, six months later. Further, Cox and the apartment manager, Cathy Rehma, knew of the "match test,"[2] but there was no evidence either one, or any other Columbia employee, ever performed this test prior to the incident.
 
 
 6
 On Sunday, May 26, 1991, the day after the poisoned roommates were discovered, an inspector from the Union Electric Company, the natural gas distributor, examined the five water heaters. While testing them, he discovered that if only one or two heaters were running, the draft was not strong enough for proper ventilation of the fumes through the vent-pipe. If all five heaters were running, however, the resulting draft would vent properly. The inspector found that after running some of the water heaters for an hour the amount of carbon monoxide in the utility room was 42 parts per million. Union Electric considers a level of 35 parts per million to be acceptable. The inspector then "red-tagged" the water heaters, which means that the water heaters were shut off and that gas service could not be resumed until the problems with the water heaters were resolved. In his written report, the inspector noted that it appeared that the water heaters were creating a back draft and allowing carbon monoxide to enter into the apartment building.
 
 II. DISCUSSION
 
 7
 Columbia first argues the district court erred in denying its motion for judgment as a matter of law. Columbia argues that the evidence was insufficient as a matter of law to establish that it had either actual or constructive knowledge of the alleged latent defect, i.e. the defective water heating system, and that the evidence was insufficient to establish the carbon monoxide produced by the water heating system was the proximate cause of the carbon monoxide poisoning. We address the proximate cause issue first.
 
 
 8
 When federal jurisdiction is premised on diversity of citizenship, a federal district court applies the sufficiency standard of the state in which it sits. Burke v. Deere & Co., 6 F.3d 497, 511 (8th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1063, 127 L.Ed.2d 383 (1994). Under Missouri law, when reviewing the denial of a motion for judgment notwithstanding the verdict, we view all facts and reasonable inferences in the light most favorable to the prevailing party and the judgment is to be upheld under any reasonable theory presented and supported by the evidence. Shannon v. Welch, 858 S.W.2d 748, 750 (Mo.Ct.App.1993). A jury verdict will not be overturned unless "there is a complete absence of probative facts to support it." Dildine v. Frichtel, 890 S.W.2d 683, 685 (Mo.Ct.App.1994) (citations omitted).
 
 
 9
 In Missouri, the test for proximate cause is whether, after the accident, "the injury appears to be the natural and probable consequence, unbroken by any new cause, of the act or omission of the defendant, without which the accident would not have occurred." Buck v. Union Electric Co., 887 S.W.2d 430, 434 (Mo.Ct.App.1994). It is undisputed that the water heaters in the Gatehouse Apartments produce carbon monoxide. The evidence at trial strongly indicated that these water heaters were in fact the only possible source of the carbon monoxide that poisoned plaintiffs. Columbia suggested that a pilot light on a gas furnace in either plaintiffs' apartment or a neighboring apartment may have been the source, but Union Electric records established that the gas to those furnaces was turned off several days before the incident. Further, plaintiffs testified that, because of warm weather around the time of the incident, they had in fact turned on their air conditioner. The circumstantial evidence overwhelmingly suggested that the water heaters were the proximate cause of plaintiffs' injuries. Thus, Columbia's argument that the evidence was legally insufficient to establish proximate cause is completely without merit.
 
 
 10
 The main issue on this appeal is whether Columbia had actual or constructive knowledge of the defective water heating system. Plaintiffs' theory at trial was that Columbia breached its duty to maintain the water heating system, common to all tenants, in a reasonably safe condition. Under Missouri law, a landlord is legally obligated to maintain in a "reasonably safe condition" those portions of the rental property over which the landlord retains "control." Lemm v. Gould, 425 S.W.2d 190, 194 (Mo.1968) (Lemm) (citations omitted); see Niman v. Plaza House, 471 S.W.2d 207, 210 (Mo. banc 1971); Kilmer v. Browning, 806 S.W.2d 75, 79 (Mo.Ct.App.1991). Before liability may attach, however, the plaintiff must show that the landlord had either actual or constructive knowledge of the defective condition. Lemm, 425 S.W.2d at 197. If Columbia did not have actual knowledge of the defect, but, through the exercise of ordinary care, would have discovered the defect, Columbia will be charged with the failure to correct it. See Mo. Approved Instructions--Civil (MAI) Sec. 22.05 (4th Ed.1991). "Ordinary care" is that degree of care which an ordinarily careful and prudent person would use under the same or similar circumstances. See MAI Sec. 11.07. Because we find the issue of constructive knowledge to be dispositive, we will not address the question whether Columbia had actual knowledge of the defect.
 
 
 11
 In Missouri, whether a landlord had constructive knowledge of a defective condition is a question of fact for the jury. Lemm, 425 S.W.2d at 197. The question on this appeal is therefore whether there was sufficient evidence as a matter of law to allow the jury to reasonably conclude that Columbia had constructive knowledge of the defective water heating system. We hold that there was.
 
 
 12
 It is undisputed that Columbia had exclusive control of the water heaters and the utility room. Further, it is undisputed that a Columbia employee set up this unique five-heater system to cut down on energy costs. Columbia claims in its brief that a match test was regularly performed on the water heating system, but the record does not support this assertion. The record does, however, reveal that a Union Electric employee had demonstrated the match test to Rehma some time prior to the poisoning incident. This Union Electric employee told her to do the test once a month. Rehma could not remember, however, the exact date she learned the match test, and in fact, she never performed the test. Further, John Cox, the Columbia employee who had primary responsibility for water heating and ventilation at Columbia's properties, also admitted that he never believed he had any reason to test the ventilation system before the carbon monoxide poisoning incident. When the Union Electric inspector arrived at the apartment building on the day after the incident, the inspector performed a match test and immediately discovered that the flue was not venting properly.
 
 
 13
 Columbia argues that there were no prior complaints about the water heating system which would have put them on notice of the defect. However, Columbia fails to recognize that the law imputes constructive knowledge to landlords in cases of such defects to enforce their duty to exercise ordinary care in maintaining their premises in a reasonably safe condition. If, as a matter of fact, the jury found that Columbia could have discovered the defect, the jury necessarily found that Columbia failed to exercise the degree of ordinary care that an ordinarily careful and prudent person would use in the same or similar circumstances. Columbia introduced no evidence to demonstrate that it ever tested the ventilation of its water heating system prior to the carbon monoxide poisoning incident. We therefore cannot say that the jury was unreasonable for finding Columbia liable. On the facts of the present case, the jury may have reasonably found that Columbia's failure to test the ventilation of its water heating system did not represent the exercise of ordinary care and that, if Columbia had exercised such care, it, like the Union Electric inspector, would have readily detected the defect in the water heating system. Therefore, we hold that the evidence was not insufficient as a matter of law to support the jury's verdict.
 
 III. CONCLUSION
 
 14
 The other points raised by Columbia on this appeal are without merit. For the reasons discussed above, the judgment of the district court is affirmed.
 
 
 
 [1]
 The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 This is a test to check for proper ventilation in which one holds an extinguished match to a flue and watches the trail of smoke